CTM CONSTRUCTION, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
CTM Constr., Inc. v. Commissioner
Docket No. 5071-84.
United States Tax Court
T.C. Memo 1988-590; 1988 Tax Ct. Memo LEXIS 619; 56 T.C.M. (CCH) 971; T.C.M. (RIA) 88590; December 28, 1988. Pasquale P. Caiazza, for the petitioner. Benjamin Duncan, for the respondent. WRIGHT
MEMORANDUM FINDINGS OF FACT AND OPINION WRIGHT, Judge: In a statutory notice of deficiency dated November 30, 1983, respondent determined a deficiency in petitioner's income tax for taxable year ending August 31, 1980, in the amount of $ 50,857 and an *620 addition to tax pursuant to section 6653(a)[1] in the amount of $ 2,542.85. After concessions, [2] the issues for our consideration are (1) whether petitioner properly claimed business expense deductions for costs incurred in building houses on land belonging to petitioner's sole shareholders, and (2) if not, whether petitioner is liable for an addition to tax under section 6653(a). FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulated facts and attached exhibits are incorporated herein by this reference. Petitioner, CTM Construction, Inc. (hereinafter referred to as petitioner or the corporation), was incorporated under the laws of the State *621 of California. At the time of filing the petition on February 29, 1984, petitioner's principal place of business was in Corona, California. Petitioner, a cash basis taxpayer, timely filed an income tax return for taxable year ending August 31, 1980, with the Internal Revenue Service Center in Fresno, California. Since its incorporation, petitioner's only shareholders have been Carl T. and Mary Lou Mansker. [3] Prior to incorporation, Carl Mansker was co-owner of a subcontracting business, Mansbelk, which did "finish carpentry" work for general contractors which included the installation of trim, cabinets, doors and moldings as well as painting interior walls. Carl Mansker left Mansbelk to form his own finish carpentry business. Petitioner generally obtained work by bidding to provide subcontracting services, comprised primarily of skilled labor, to a general contractor, although occasionally petitioner obtained jobs directly. During the year in issue, petitioner held licenses to perform general contracting services as well as finish carpentry work. Petitioner has never paid dividends. *622 From the time of incorporation, Carl Mansker was the corporation's president and Mary Lou Mansker, his wife, was the vice-president and secretary. Throughout the years in issue, Carl Mansker oversaw daily operations of the business and Mary Lou Mansker managed the office. She was responsible for daily bookkeeping and payroll. She wrote all the corporation's checks and handled incoming receipts. She was responsible for maintaining regular business correspondence and filing mechanic's liens. Mary Lou Mansker was assisted by Ramon Raugust (Raugust), the corporation's accountant, in organizing the corporation's bookkeeping system. Although not formally trained as a bookkeeper, Mary Lou Mansker, a high school graduate, had taken some business courses at night school. Raugust initially designed the corporation's books, designating certain categories of business income and expenses and leaving room for other categories to be started as the need arose. However, Raugust did not give Mary Lou Mansker detailed instructions on keeping the books, but instead left her to allocate items among the various categories as she saw fit. At the end of the corporation's fiscal year, Mary Lou *623 Mansker gave the books and ledgers to Raugust who reviewed them to a limited degree and made occasional correcting entries. He then posted the entries from the daily ledgers into the general ledger. Raugust also prepared income tax returns for both the corporation and the Manskers based on the materials he had been provided. Mary Lou Mansker also kept the corporate minutes. When counseling the Manskers at the time of incorporation, Raugust explained the necessity of keeping an accurate annual account of their activities in the corporate minutes. Each time the corporation made a loan to the Manskers or borrowed money from them, the transaction was authorized during the corporate meetings and recorded in the proper books and journals. The corporate minutes reflect that on September 5, 1978, petitioner lent $ 10,000 to Carl Mansker and petitioner authorized its officers to invest an unspecified amount of money in ventures designed to make a profit for petitioner. At some time prior to the year in issue, Carl and Mary Lou Mansker purchased several lots of land in Victorville, California. The purchased property was located in a development with streets and sewers, but where houses *624 had not yet been built. Carl and Mary Lou Mansker purchased and began to develop their property using a down payment from their savings account and a loan obtained from Carl Mansker's brother, Troy. Petitioner was hired as the general contractor. The Manskers purchased architectural plans for a three-bedroom "spec house," and petitioner arranged for subcontractors to do the necessary construction. When the project required finish carpentry, petitioner provided the labor and materials itself. When the first house was finished, the second was started with the sale proceeds from the first. The first house was built at 13199 Meteor Drive in Victorville (the Meteor Drive house). It was placed on the market in 1979 and soon sold for $ 70,000. However, upon discovering that the buyer was about to default, the Manskers quickly assumed the mortgage. The Manskers spent between $ 3,000 and $ 4,000 to prevent the institution of foreclosure proceedings against the property and to make the house ready for resale. Prior to resale, the house was rented at $ 500 per month. Sometime later the Manskers sold the Meteor Drive house for about $ 106,000. Meanwhile, construction on the second house, *625 located at 12576 Fairway Drive in Victorville (the Fairway Drive house) was underway. Before construction was completed, the Manskers sold the Fairway Drive house for $ 106,000, but approximately a year later the buyer defaulted. The property was subject to foreclosure and after paying $ 10,000, the Manskers were able to take possession of the house once more. The Fairway Drive house stood vacant for some time and had to be readied for rental. It was finally rented at $ 600 per month. Finally, the third house was built at 13275 Riverview Drive in Victorville (the Riverview Drive house) and completed by 1981. Although the Manskers placed the house on the market several times, no reasonable offers were received. The Riverview Drive house was rented after four months. Neither the Fairway Drive house nor the Riverview Drive house had been sold by the time of trial. Throughout the year in issue, the deeds to the three houses were held by Carl and Mary Lou Mansker. The costs of building all three houses were paid by petitioner and recorded in the corporate books along with petitioner's other business costs. Petitioner was never paid or reimbursed for these costs. Carl and Mary *626 Lou Mansker received the receipts from the sale of the Meteor Drive house and the rental income from all three of the houses. On its corporate income tax return for taxable year ending August 31, 1980, petitioner claimed deductions in the amount of $ 93,058 for materials, supplies, subcontractor expenses and equipment rental used to build the houses on Meteor Drive, Fairway Drive and Riverview Drive. Similarly, petitioner claimed deductions for expenses related to repairs to two other residences owned by Carl and Mary Lou Mansker, including their personal residence. In computing basis for the Meteor Drive house, the Fairway Drive house and the Riverview Drive house, Carl and Mary Lou Mansker included in basis the full amount of petitioner's costs associated with the construction. The Manskers included in income the amount of rental income they received. OPINION The first issue for our consideration is whether the costs paid by petitioner for the construction of the Meteor Drive house, the Fairway Drive house and the Riverview Drive house constituted a constructive dividend to shareholders Carl and Mary Lou Mansker and were therefore improperly claimed as business expense deductions *627 by petitioner. Sections 301(c) and 316(a) provide, in pertinent part, that the fair market value of property distributed by a corporation to its shareholder in respect to stock is income to the shareholder to the extent of the corporation's current and accumulated earnings and profits. Expenditures by the corporation which benefit the shareholder may result in constructive dividends. See, e.g., Ireland v. United States,621 F.2d 731 (5th Cir. 1980); Enoch v. Commissioner,57 T.C. 781 (1972). Section 1.317-1, Income Tax Regs., provides that "the term 'property' * * * means any property (including money, securities, and indebtedness to the corporation) other than stock or rights to acquire stock, in the corporation making the distribution." Construction services performed by the corporation which improve property owned by the shareholders constitute a constructive dividend. Magnon v. Commissioner,73 T.C. 980 (1980); *628 Benes v. Commissioner,42 T.C. 358 (1964), affd. 355 F.2d 929 (6th Cir. 1966). The determination of the existence of constructive dividends is a facts and circumstances test. Busch v. Commissioner,728 F.2d 945 (7th Cir. 1984), affg. a Memorandum Opinion of this Court; Pierce v. Commissioner,61 T.C. 424, 430 (1974); Chism's Estate v. Commissioner,322 F.2d 956 (9th Cir. 1963), affg. a Memorandum Opinion of this Court. The dispositive inquiry is whether the corporation has conferred a benefit on its shareholder in order to distribute available earnings and profits without expectation of repayment. Noble v. Commissioner,368 F.2d 439, 443 (9th Cir. 1966), affg. a Memorandum Opinion of this Court; Truesdell v. Commissioner,89 T.C. 1280 (1987). We must determine if the distribution was made primarily for the benefit of the shareholder. Loftin & Woodard, Inc. v. United States,577 F.2d 1206, 1214 (5th Cir. 1978). The absence of any formal action by *629 the board of directors need not preclude a finding that a constructive dividend occurred. Yelencsics v. Commissioner,74 T.C. 1513 (1980). Generally, a constructive distribution occurs when corporate assets are diverted to or for the benefit of a shareholder without adequate consideration for the diversion. Sammons v. Commissioner,472 F.2d 449 (5th Cir. 1972), affg. in part and revg. in part a Memorandum Opinion of this Court. Corporate payments to shareholders which constitute dividends are not properly deductible as ordinary and necessary business expenses by the corporation. American Properties, Inc. v. Commissioner,28 T.C. 1100, 1115 (1957), affd. per curiam 262 F.2d 150 (9th Cir. 1958). Petitioner bears the burden of proving that the payments were not constructive dividends and were properly claimed as deductions. Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142(a). We conclude that petitioner has failed to meet that burden of proof. The record establishes unequivocally that the costs *630 deducted by petitioner which are at issue were all attributable to the construction of three houses on land owned by Carl and Mary Lou Mansker. The costs were entered on the corporation's books as if they were routine costs associated with one of the corporation's ordinary business projects. However, the corporation was never paid for its work or reimbursed for its expenditures. When construction was complete, the Manskers attempted with mixed success to sell the houses and retained all the sales proceeds. When the houses proved unmarketable they were rented and all the rental proceeds were retained by the Manskers. There is no alternative to our conclusion that petitioner's payments for labor and materials used in the construction of the three houses for Carl and Mary Lou Mansker conferred a substantial benefit on the shareholders. For a relatively small portion of the total cost, Carl and Mary Lou Mansker received three new houses which they are able to rent or sell for their own exclusive benefit. Petitioner raised a flurry of arguments to contradict respondent's determination. Petitioner concedes that the corporation paid and then deducted the expenses for houses built on *631 land belonging to the Manskers but argues that because the Manskers have not been able to sell the houses they have received no benefit to the Manskers. However, petitioner concedes that the houses had substantial economic value at the time of distribution. The vagaries of market fluctuation do not preclude a finding that a benefit has been conferred. Although the market may temporarily impede the profitable sale of the houses, Carl and Mary Lou Mansker own three completed homes where they once had only undeveloped land. Petitioner's second argument is that because Mary Lou Mansker entered the costs of the three houses on petitioner's books as if they were routine business costs they should be so characterized. We find, however, that such behavior is equally consistent with an attempt to bury the costs in order to avoid detection. Furthermore, petitioner also provided contracting services for the Manskers with respect to their personal residence during the year in issue, and Mary Lou Mansker included these costs in the corporate books as ordinary business expenses. Petitioner's next argument is that the corporation and the shareholders had an oral agreement to share the receipts *632 from the sale of the houses. Carl Mansker testified that he planned to give 40 percent of the sale proceeds to petitioner and keep only 60 percent for himself, but that this arrangement was never reduced to writing. Although the customary share for the contractor was 20 percent, Mansker explained that petitioner's share would be twice that amount because petitioner agreed to wait until the houses had all been sold before claiming its portion of the proceeds. We simply do not find this version of events to be consistent with petitioner's general practice. The record establishes that Carl and Mary Lou Mansker understood the technical requirements involved in dealing with a closely held corporation. They scrupulously kept annual corporate minutes and noted significant transactions, such as loans between the corporation and the shareholders. However, petitioner failed to explain why the profit division agreement would not have been recorded when other less important transactions were. Because dealings between the shareholders and the closely held corporation are particularly easy to manipulate, we examine such transactions with rigorous scrutiny. Electric & Neon, Inc. v. Commissioner,56 T.C. 1324, 1339 (1971), *633 affd. without published opinion 496 F.2d 876 (5th Cir. 1974). Furthermore, petitioner concedes that the risk of loss with respect to the three houses was born by the Manskers at all times. This further undermines petitioner's contention that the corporation and the Manskers were co-venturers in the construction of the three houses. Petitioner's final argument is that the Manskers only did what Raugust told them to do and that they failed to record the profit-sharing agreement only because Raugust did not properly advise them. Regardless of whether Raugust had a fiduciary duty to warn the Manskers of all of the possible pitfalls of operating in corporate form, as petitioner asserts, the record indicates that Mary Lou Mansker understood that the corporation and the shareholders are separate entities. She knew that significant corporate decisions and actions had to be recorded. However, despite this awareness, she failed to record the corporation's purported profit sharing agreement. We conclude that the purported profit sharing agreement is not worthy of our belief. Of greater import is the fact that the land and the houses were all held in the Manskers' name alone, *634 and, without a written agreement, the corporation had no rights to a portion of the sale proceeds. Thus, we conclude that the payments for costs associated with the construction of the Meteor Drive house, the Fairway Drive house and the Riverview Drive house were made by the corporation with the primary intention and result of conferring benefit upon the shareholders, and, therefore, constitute constructive dividends. Respondent asserts, without objection from petitioner, that petitioner's earnings and profits at the time of the distribution, if the improperly claimed deductions were added back, equalled or exceeded the amount of the constructive dividend. The second issue for our consideration is whether petitioners are liable for an addition to tax under section 6653(a). Section 6653(a) provides for an addition to tax if any part of the underpayment in tax is attributable to negligent or intentional disregard of the rules or regulations. Petitioner bears the burden of proving that respondent's determinations should not be sustained. Hall v. Commissioner,729 F.2d 632 (9th Cir. 1984), *635 affg. a Memorandum Opinion of this Court; Hanson v. Commissioner,696 F.2d 1232, 1234 (9th Cir. 1982), affg. a Memorandum Opinion of this Court; Luman v. Commissioner,79 T.C. 846, 860-861 (1982). Negligence under section 6653(a) is defined as lack of care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner,85 T.C. 934, 947 (1985). In opposition to respondent's determination of additions to tax, petitioner argues that Raugust, the accountant, was primarily responsible for petitioner's failure to pay all the necessary tax. Petitioner maintains that Raugust should have advised Mary Lou Mansker that the cost of constructing the three houses could not be deducted as an ordinary corporate business expense. However, the record indicates that Raugust had no reason to know that Mary Lou Mansker might have made such an error. Because the expenses were not separately designated in the corporate books but were merely included among all the other business expenses, Raugust could not have known of their existence unless Mary Lou Mansker informed him. Similarly, Raugust *636 testified that it was not his practice to carefully review petitioner's books for mistakes but instead he customarily relied on Mary Lou Mansker's bookkeeping judgment. Furthermore, although Mary Lou Mansker was not a college graduate, the record indicates that her awareness of tax law was sufficient to inform her that payments which the corporation made to build houses for her and her husband to sell should not be claimed as deductions by the corporation. Thus, we conclude that petitioner has failed to establish that respondent's determinations of addition to tax are erroneous and they will be upheld. In light of the foregoing, Decision will be entered for the respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Petitioner conceded that the following amounts were improperly claimed as deductions and were constructive dividends: $ 18,785 for materials and supplies; $ 6,000 for rent; $ 4,803 in automobile expenses; $ 4,246 for depreciation; $ 450 for telephone expenses; and $ 3,703 for travel expenses.↩
3. Both petitioner and respondent consistently refer to Carl and Mary Lou Mansker as full and equal shareholders. However, petitioner's corporate income tax returns for taxable years 1978 and 1979 indicate that Carl Mansker owned one hundred percent of the outstanding stock and Mary Lou Mansker owned none.↩